UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI

IN RE:  MICHAEL ALLEN COLLIER                           CASE NO. 05-14818

CITIBANK (South Dakota), N.A.                                      PLAINTIFF

VERSUS                                                ADV. PROC. NO. 05-1261

MICHAEL ALLEN COLLIER                                           DEFENDANT

OPINION

On consideration before the court is the complaint filed by the plaintiff, Citibank (South Dakota), N.A., (Citibank); answer to said complaint having been filed by the debtor, Michael Allen Collier, (Collier); and the court, having heard and considered same, hereby finds as follows, to-wit:

I.

The court has jurisdiction of the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157. This is a core proceeding as defined in 28 U.S.C. §157(b)(2)(I).

II.

Citibank filed its complaint against Collier seeking a determination that certain credit card obligations owed by Collier were non-dischargeable pursuant to §523(a)(2)(A) of the Bankruptcy Code which provides as follows, to-wit:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
> . . . . .

Case 05-01261   Doc 23   Filed 06/16/06   Entered 06/16/06 14:43:56   Desc Main
                           Document      Page 2 of 10

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by--
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

Collier had two credit cards issued to him by Citibank which are identified hereinbelow, to-wit:

A. Citi Diamond Preferred Card, having a $9,600.00 credit limit and a balance owing of $10,828.33.

B. AT&T Universal Rewards Card, having a $9,600.00 credit limit and a balance owing of $11,546.23.

Collier utilized the aforementioned credit cards and other credit cards to substantially subsidize his living expenses. According to his bankruptcy schedules, Collier has unsecured debts totaling $63,150.00, of which approximately $50,000.00 is credit card debt. He has two secured debts, totaling $39,884.86, one of which is secured by his 2004 mobile home and the other by his 2002 Nissan Xterra. Both of these secured claims are to be reaffirmed.

According to the testimony, Collier had unusually large expenses which were incurred in caring for his terminally ill father, who is now deceased, and his elderly mother. He was required to employ sitters for both of his parents while he was working at his place of employment.

Collier is divorced, but has a daughter, age 23, and a granddaughter, age 10 months. His Schedule I reflects monthly income in the sum of $2,254.16, and his Schedule J reflects monthly expenses in the sum of $2,155.80. Unfortunately, Collier's current employment at BASF will terminate in late 2006 or early 2007 due to a plant re-location.

For all practical purposes, Collier's use of the two Citibank credit cards began in January, 2005, and terminated in late March or early April, 2005. Excepting the finance charges and fees, the balances owing on the credit cards, noted hereinabove, were incurred in this short span of time. A listing of Collier's charges, including several cash advances, are reflected on Citibank's Exhibit 1 and Exhibit 2, which are the account statements.

In his testimony, Collier testified that he fully intended to pay these debts. However, a review of the statements indicates that he made only a few small payments. Once Collier exceeded the credit limits applicable to the cards, the amounts which exceeded the credit limits were added to the minimum payments which were due each month. This, in effect, escalated the minimum payments to an amount which Collier clearly could not afford, particularly considering that he had exceeded the limits on both of the cards. Collier did not comprehend why the minimum payments had risen so dramatically. He did not realize that if he reduced the outstanding balance below the credit limits for each of the cards that the minimum payments would have then become much more manageable. Fearing that he would be sued and his paycheck garnished, he filed bankruptcy on July 14, 2005.

Because of Collier's bankruptcy filing date and the dates of the last credit card transactions, Citibank is not entitled to the presumption of non-dischargeability relating to the purchase of luxury goods or to the taking of cash advances that are extensions of consumer credit found in §523(a)(2)(C)[1] of the Bankruptcy Code, the version of which would be applicable to this case since it was filed prior to the effective date of the Bankruptcy Abuse Prevention Consumer

---

[1] Subsequently in this opinion, all Code sections will be considered as the U.S. Bankruptcy Code unless designated otherwise.

Protection Act of 2005 (BAPCPA).

### III.

The Fifth Circuit Court of Appeals in Matter of Mercer, 246 F.3d 391 (5th Cir. 2001), reaffirmed the elements necessary to be established in a credit card non-dischargeability proceeding filed pursuant to §523(a)(2)(A), as follows:

> ...Accordingly, for each card-use, and by a preponderance of the evidence, Grogan v. Garner, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), UCS was required to prove: (1) Mercer made a representation; (2) it was knowingly false; (3) it was made with the intent to deceive UCS; (4) UCS actually *and* justifiably relied on it; and (5) UCS sustained a loss as a proximate result of its reliance.

246 F.3d 391 at 403.

In this proceeding, elements (1) and (5) have obviously been established by Citibank. Elements (2), (3), and (4), which are generally more problematic, will be discussed more thoroughly.

Insofar as "fraudulent intent" is concerned, the tandem label that this court will utilize to discuss Mercer's elements (2) and (3), the Ninth Circuit Court of Appeals decision in In re Anastas, 94 F.3d 1280 (9th Cir. 1996), created a substantial burden for a creditor to prevail in a credit card non-dischargeability case. In Anastas, the debtor had incurred sizeable gambling losses utilizing his credit card cash advances while he was obviously insolvent. The court held, however, that an inability to repay a loan was not sufficient to presume a lack of intent to repay. This meant that the creditor had to prove that the debtor, when the charge was incurred, could not have realistically expected to repay the debt, and, in fact, did not intend to do so.

Another approach to establishing fraudulent intent in credit card cases has actually been in existence since the issuance of the Ninth Circuit Bankruptcy Appellate Panel's Dougherty

decision in 1988, In re Dougherty, 84 B.R. 653 (9th Cir. BAP 1988). In Dougherty, the court crafted a totality of the circumstances test, examining a non-exclusive list of twelve objective factors to determine whether a credit card debt was incurred through fraud. These factors are listed hereinbelow:

1. The length of time between when the charges were made and the filing of bankruptcy;

2. Whether or not an attorney had been consulted concerning the filing of the bankruptcy case before the charges were made;

3. The number of charges made;

4. The amount of the charges;

5. The financial condition of the debtor at the time the charges were made;

6. Whether the charges were above the credit limit of the account;

7. Whether the debtor made multiple charges on the same day;

8. Whether or not the debtor was employed;

9. The debtor's prospects for employment;

10. The financial sophistication of the debtor;

11. Whether there was a sudden change in the debtor's buying habits; and

12. Whether the purchases made were for luxuries or necessities.

Id. at 657.

In a case preceding the Anastas decision, the Ninth Circuit used the Dougherty factors in In re Eashai, 87 F.3d 1082 (9th Cir. 1996), reasoning that the twelve factors were relevant to an objective analysis of the debtor's intent. Id. at 1087-88.

Drawing from those courts that had earlier stated that an inability to pay should translate into an exception from discharge, the Dougherty twelve part test included the debtor's lack of an ability to repay. However, although it is only one factor, it is given substantial weight in the ultimate conclusion.

Another decision from the Ninth Circuit is In re Hashemi, 104 F.3d 1122 (9th Cir. 1996). Hashemi was cited with approval by the Fifth Circuit in its Mercer decision noted hereinabove. The Hashemi court, perhaps recognizing the onerous burden placed on creditors by the Anastas decision, decided that the creditor needed to prove only that the relevant facts supported a finding that the debtor did not intend to repay the charges at the time they were incurred. The Hashemi court specifically pointed to the twelve Dougherty factors and stated, "these factors are nonexclusive; none is dispositive, nor must a debtor's conduct satisfy a minimum number in order to prove fraudulent intent. So long as, on balance, the evidence supports a finding of fraudulent intent, the creditor has satisfied this element." Id. at 1125.

Once the fraudulent intent hurdle has been overcome, the creditor must then establish "actual and justifiable reliance" required by Mercer's element (4). A significant decision which addresses this element is Field v. Mans, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed. 2d 351 (1995), decided by the United States Supreme Court. Although this was not a credit card case, it involved commercial fraud allegations based on §523(a)(2)(A). The debtor, an individual guarantor on a corporate loan, had apparently made certain misrepresentations to the lender to induce the loan transaction. After the corporation defaulted on the repayment of the debt, the debtor filed bankruptcy and the lender sought to have the individual guaranty excepted from discharge. Id. at 61-2. The bankruptcy court dismissed the lender's complaint concluding that

6

the lender had not <u>reasonably</u> relied upon the debtor's representations. The decision was appealed to the Supreme Court which determined that the standard of reliance was not <u>reasonable</u>, but <u>justifiable</u>. Id. at 74. Although this conclusion may seem like splitting hairs, the bottom line is that justifiable reliance is a less severe standard than reasonable reliance in establishing a commercial fraud case.

More importantly, the <u>Field v. Mans</u> decision made it abundantly clear that the reliance element had to be proved in fraud cases where the complaint was based on §523(a)(2)(A). Ironically, §523(a)(2)(B), which pertains to a false written financial statement, expressly provides that the standard is <u>reasonable</u> reliance.

Quite frankly, many courts in credit card cases had begun to ignore the reliance element altogether, whether reasonable or justifiable, primarily focusing attention on the fraudulent intent elements. After <u>Field v. Mans</u>, the courts realized that this element had to be addressed.

In the Fifth Circuit's <u>Mercer</u> decision, the en banc court determined that each use of a pre-approved credit card by the Chapter 7 debtor was in the nature of an implied representation by the debtor of an intent to repay any credit extended. The court also concluded that the credit card issuer "actually relied," as a matter of law, on the debtor's implied card-use representation regarding her intention to repay her credit card debts. The case was remanded through the district court to the bankruptcy court so that determinations could be made as to the debtor's knowing falsity, her intent to deceive, as well as, whether her representations were justifiably relied upon by the credit card issuer. The following language in <u>Mercer</u> is instructive, to-wit:

> Even assuming UCS, a sophisticated lender with considerable resources, could have conducted the type investigation envisioned by the bankruptcy court, its failure to do so does *not per se* preclude finding it was justified in relying on Mercer's card-use

7

representations of intent to pay, because the information it obtained prior to card-issuance *appears*, based on the earlier-discussed evidence, *not* to have raised "red flags" requiring further investigation. Of course, justifiable reliance is a question of fact. See Coston v. Bank of Malvern (Matter of Coston), 991 F.2d 257, 260 (5th Cir. 1993) (en banc) (pre-

*Field*; reasonable reliance question of fact). Because the bankruptcy court applied an incorrect legal standard in finding *no* justifiable reliance, on remand it must make that determination, under the correct legal standard.

For justifiable reliance, the focus should be on whether UCS, based on its credit screening and its relationship with Mercer during her brief card-use, had reason to believe she would *not* carry out her representation, through card-use, of intent to pay. Relevant to that determination are the circumstances under which the representation was made, including the fact that it was made for the purpose of inducing UCS to act in reliance upon it, and the form and manner in which it was expressed. See Restatement (Second) of Torts §544 cmt. a. And, facts pertinent to that inquiry include, but are *not* limited to: (1) UCS' decision to offer the pre-approved card, based on an examination of Mercer's credit history-twice *before* acceptance, and again *between* acceptance and issuance; (2) the terms of the card-agreement, which provided that Mercer's card-use signified her acceptance of those terms, including the requirement that she pay the loans incurred, by making at least the minimum monthly payments; and (3) Mercer's reaching her limit within the first billing cycle, within the scope of the card-agreement, *and before* UCS had any reason to suspect she would *not* pay.

246 F.3d 391 at 422-23.

. . . . .

For Mercer's §523(a)(2)(A) nondischargeability *vel non*, we hold, as a matter of law, for each card-use: she represented her intent to pay the loan; *if her representation was knowingly false*, she intended to deceive UCS; it actually relied on the representation by authorizing the requested loan; and its loss was proximately caused by such reliance. On remand, to be determined for each representation is whether: it was *knowingly false*; and UCS *justifiably relied* on it.

Id. at 425.

IV.

Applying the law developed by the Fifth Circuit in the Mercer decision, this court must assume that on each occasion that Collier utilized his Citibank credit cards that he impliedly

8

represented an intent to repay the credit extended. Further, the court must assume that Citibank <u>actually</u> relied, as a matter of law, on Collier's implied representations. Because Collier "ran-up" these charges in a relatively short span of time during which he made a few small payments, as well as, because the total charges did not exceed the credit limits for the two cards until Collier had terminated their use, the court must additionally assume that Citibank <u>justifiably</u> relied on Collier's implied representations. The court simply does not see that there were any "red flags" that would serve as sufficient warnings to Citibank that would negate this latter reliance as to Collier's use of the cards.

As a result of the foregoing conclusions, Citibank has established all of the <u>Mercer</u> elements by a preponderance of the evidence with the exception of elements (2) and (3), which focus on the credit card user's fraudulent intent. In making a determination of whether there was fraudulent intent on Collier's part, this court will look to the twelve factors outlined in the <u>Dougherty</u> case which were adopted by the Ninth Circuit in <u>Hashemi</u>, as well as, by the Fifth Circuit in <u>Mercer</u>. Not surprisingly, there are a number of these factors that squarely apply to this particular proceeding, to-wit:

    The length of time between when the charges were made and the filing of bankruptcy.

    The number of charges made

    The amount of the charges.

    The financial condition of the debtor at the time the charges were made.

    Whether the debtor made multiple charges on the same day.

    Whether there was a sudden change in the debtor's buying habits.

    Whether the purchases made were for luxuries or necessities.

As noted earlier, the Hashemi court, when considering the aforementioned factors, stated, "these factors are non-exclusive; none is dispositive, nor must a debtor's conduct satisfy a minimum number to prove fraudulent intent. So long as, on balance, the evidence supports a finding of fraudulent intent, the creditor has satisfied this element." Hashemi, 104 F.3d at 1125.

The court does not feel that Citibank is completely blameless in its financial relationship with Collier. Citibank furnished two credit cards, each having a credit limit of $9,600.00, to Collier, an individual whose monthly income barely exceeded his expenses, who had recently been divorced, and who was caring for two elderly parents. Collier took what was given to him and "ran-up" charges and cash advances that neared and then exceeded the credit limit for each card in short order. Some of these charges were for necessities and others were obviously not. The court has carefully reviewed the account statements and, in an effort to be fair to both parties, has distinguished between the charges that appear to be for necessities and those that appear to be otherwise. The court, following this allocation, concludes that a non-dischargeable judgment should be rendered against Collier in the sum of $11,155.26. ($5,472.29 on the Citi Diamond Preferred Card and $5,682.97 on the AT&T Universal Rewards Card.) Since the credit card agreements provide for the recovery of costs and attorney's fees, the court will award attorney's fees in the sum of $3,715.00, plus allow all costs accrued by virtue of this proceeding to be taxed to Collier. Interest on these sums will be permitted to accrue at the highest lawful rate following the entry of a judgment contemporaneously herewith.

This the 13th day of June, 2006.

/s/ David W. Houston, III
DAVID W. HOUSTON, III
UNITED STATES BANKRUPTCY JUDGE